**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

CARLTON PAYNE,                          No. C 09-4084 CW (PR)

        Plaintiff,                      ORDER GRANTING DEFENDANTS'
                                        MOTION FOR SUMMARY JUDGMENT AND
    v.                                  DISMISSING AMENDED CLAIMS

CORRECTIONAL OFFICER C. SENUTA,
et al.,                                 (Docket no. 20)

        Defendants.
_____/

                        INTRODUCTION

    Plaintiff Carlton Payne, a state prisoner currently
incarcerated at Pelican Bay State Prison (PBSP), brought this pro
se civil rights action pursuant to 42 U.S.C. § 1983 alleging claims
of deliberate indifference to safety, excessive force, retaliation
and supervisory liability.  These allegations stem from a March 24,
2009 incident involving PBSP Correctional Officers C. Senuta, J. R.
Bemrose and R. J. Lesina, in which Plaintiff was released into a
recreational yard along with another inmate who subsequently fought
with him.  Plaintiff seeks monetary damages.

    On March 22, 2010, Plaintiff filed a request to add PBSP
Acting Warden Francisco Jacquez as a Defendant in this action.

    On May 10, 2010, the Court conducted an initial screening of
Plaintiff's complaint pursuant to 28 U.S.C. § 1915A(a) and found
cognizable his Eighth Amendment claims against Defendants Senuta,
Bemrose and Lesina.  The Court dismissed Plaintiff's retaliation
claim against Defendants Senuta, Bemrose and Lesina with leave to
amend.  The Court granted Plaintiff's motion to amend the complaint
to add Defendant Jacquez, who was being sued in his supervisory
capacity.  However, the Court dismissed the supervisory liability

claim against Defendant Jacquez with leave to amend.  The Court directed Plaintiff to file his amended claims and gave him until June 9, 2010 to do so.  He was warned the failure to do so would result in dismissal of his retaliation and supervisory liability claims without prejudice.

On May 19, 2010, Plaintiff filed a letter relating to his retaliation and supervisory liability claims.  This letter was not labeled as his amendment to the complaint; however, it seems to be an effort by Plaintiff to amend his retaliation and supervisory liability claims pursuant to the Court's May 10, 2010 Order of Service.  Therefore, the Court construes it as his amendment to the complaint, and will address it below.

On October 13, 2010, Defendants moved for summary judgment on the grounds that there is no issue as to any material fact, that they are entitled to judgment as a matter of law, and that they are entitled to qualified immunity.  On November 22, 2010, Plaintiff filed a document entitled, "Declaration of Carlton Payne," which the Court construes as an affidavit in opposition to Defendants' motion for summary judgment, as explained below.  On December 7, 2010, Defendants filed their reply.

For the reasons discussed below, the Court GRANTS Defendants' motion for summary judgment.

BACKGROUND

The following facts are undisputed unless otherwise noted.

On March 24, 2009, Plaintiff was housed in PBSP's Security Housing Unit (SHU), specifically Unit C9, Cell 102.  (Payne Compl. at 1, 3.)  A control booth, which is situated on the second floor,

overlooks each of the six pods that comprise Unit C9.[1]  (Bemrose Decl. ¶ 3.)  Each pod contains eight cells -- four cells on a lower tier and four on an upper tier.  (Senuta Decl. ¶ 4.)  From the control booth, a correctional officer can see the doors on the outside of those cells, but not inside them.  (Id.)

At the far end of each pod is a concrete recreation yard.  (Grigg Decl., Ex. A at 24:3-7; Senuta Decl. ¶ 5.)  Because the wall separating each pod from its adjacent recreation yard is solid, a correctional officer can see directly into the recreation yard from the control booth only when the yard door is open.  (Id.)  In the control booth, correctional officers rely on three overhead television monitors to survey the recreation yard.  Each monitor cycles between two yards every five to six seconds.[2]  (Senuta Decl. ¶ 6.)

Control booth operators coordinate the movement of inmates in and out of their pods as well as the movement of staff entering the pods to provide inmates with food, medication, security-related assistance, etc.  (Bemrose Decl. ¶ 26; Senuta Decl. ¶ 8.)  Specifically, as part of their duties, control booth operators open doors for inmates on a list of those choosing to take turns participating in ninety minutes of recreation yard time.  (Senuta Decl. ¶ 9.)  Only one inmate is allowed in the recreation yard at a time.  (Id.)  When releasing each inmate for his recreation yard time, control booth operators generally start with the first on the list in A-Pod, release that inmate, close his cell door, open the

---

[1] Unit C9 contains pods A through F.

[2] Each television monitor cycles every five to six seconds among pods A and B, and pods C and D, as well as pods E and F.

United States District Court
For the Northern District of California

recreation yard door, wait for him to enter the yard, and then close the door behind him.  (<u>Id.</u>)  Control booth operators then perform similar actions for the other yards before cycling back to A-Pod, where, after the first inmate is returned to his cell, the process is repeated for the next inmate on the list.  (<u>Id.</u>)

A single control booth officer controls all doors in Unit C9 using an instrument panel, which regulates access to forty-eight cell doors, six doors leading into the pods, six doors leading into the recreations yards, and twelve shower doors, as well as a door leading into the unit.  (Bemrose Decl. ¶ 26; Senuta Decl. ¶ 7.) The instrument panel also has an override switch.  (<u>Id.</u>)

On March 24, 2009, Defendant Senuta was working overtime as the Unit C9 control booth operator.  (Senuta Decl. ¶ 7.)  Defendant Senuta claims that she "worked infrequently in the control booth, and only when working overtime."  (<u>Id.</u>)  One control booth operator at a time oversees each unit.  (<u>Id.</u> ¶ 3.)  In Unit C9, the control booth operators open and close the doors with an instrument panel that includes roughly eighty switches.  (Bemrose Decl. ¶ 26; Senuta Decl. ¶ 7.)  Control booth operators monitor each inmate's location at Unit C9 by placing pegs denoting each of their locations in instrument panel slots representing each of their cells.  (<u>Id.</u>)

On March 24, 2009, Defendant Bemrose worked as the Unit C9 floor officer.  (Bemrose Decl. ¶ 5.)  Defendant Bemrose's duties included conducting routine cell searches when inmates were in the recreation yards.  (<u>Id.</u>)

At around 10:20 a.m. on that same day, Defendant Bemrose contacted Defendant Senuta to ask which inmate's cell was empty because he planned to conduct a search of the empty cells in A-Pod.

4

United States District Court
For the Northern District of California

(Id.)  Defendant Senuta explained that she was preparing to release an inmate into the A-Pod recreation yard and that the inmate in cell C9-102, Plaintiff's cell, was about to exit his cell and enter the yard.  (Bemrose Decl. ¶ 6.)  She told Defendant Bremrose that she could let him know when Plaintiff's cell was empty.  (Id.)  Defendant Bemrose then went to check the unit search log to see if cell C9-102 had recently been searched.  (Id.)  As she was speaking with Defendant Bremrose, Defendant Senuta released Plaintiff for his recreational yard time.  (Senuta Decl. ¶ 12.)  Because Defendant Senuta claims to have been distracted by her conversation with Defendant Bemrose, she did not place a peg in the C9-102 slot to note that Plaintiff was in the yard.  (Id.)  Instead, she "incorrectly" placed the peg indicating which inmate was going into the yard into the C9-103 slot on the instrument panel, instead of the C9-102 slot.  (Id.)  Defendant Senuta then released the inmate in C9-103, inmate Baca, into the yard shortly after Plaintiff because she had "forgotten" that she had already released Plaintiff into the yard.  (Id.)

Defendant Bemrose returned from checking the cell search log in time to see inmate Baca quickly walk into the A-Pod recreation yard from cell C9-103.  (Bemrose Decl. ¶ 8.)  According to Defendant Bemrose, inmate Baca's quick walking speed seemed "odd" because inmates do not typically move quickly from their cells to the yard.  (Bemrose Decl. ¶ 7.)  Because Defendant Bemrose witnessed inmate Baca walking quickly into the yard and Defendant Senuta had previously informed him that Plaintiff was going into yard, Defendant Bemrose suspected that two inmates might be in the yard simultaneously.  (Bemrose Decl. ¶ 8.)  Knowing that inmates

United States District Court

For the Northern District of California

sometimes pose safety risks to other inmates, Defendant Bemrose immediately attempted to determine whether two inmates were in the A-Pod recreation yard. (Id. ¶ 9.) Defendant Bemrose quickly moved to a location where he could look up through the grating separating the control booth from the ground floor to see the overhead monitor that alternated between surveying the recreational yards at Pods A and B. (Id.) Simultaneously, Defendant Bemrose called up to Defendant Senuta, asking whether two inmates were in the A-Pod recreation yard. (Id. ¶ 10.) Believing there to be only one inmate in that yard, Defendant Senuta replied in the negative. (Senuta Decl. ¶ 14.) To confirm, Defendant Senuta locked the security camera onto the A-Pod recreation yard and saw Plaintiff and inmate Baca fighting. (Id.) Seeing two inmates in that yard from the monitor as well, Defendant Bemrose told Defendant Senuta to activate the alarm and summon additional correctional officers, which she immediately did.[3] (Bemrose Decl. ¶ 11; Senuta Decl. ¶ 14.)

Within thirty seconds of Defendant Senuta sounding the alarm, six correctional officers, including Defendant Lesina, assembled and immediately proceeded to the A-Pod recreational yard's handcuff port. (Bemrose Decl. ¶¶ 12-14; Lesina Decl. ¶¶ 2-3.) Defendant Bemrose opened the handcuff port and saw Plaintiff and inmate Baca wrestling on the ground. (Bemrose Decl. ¶ 14.) Defendant Lesina then ordered the inmates to cease fighting and separate. (Lesina Decl. ¶ 3.) Both Plaintiff and inmate Baca ignored Defendant

---

[3] Pursuant to CDCR policy, additional correctional officers are summoned to stop fights and to minimize the risk that the inmates' violence will injure those correctional officers trying to intervene. (Bemrose Decl. ¶ 13; Lesina Decl. ¶ 2.)

United States District Court
For the Northern District of California

Lesina's verbal instructions and continued to fight. (Bemrose Decl. ¶ 14; Lesina Decl. ¶ 3.) Other correctional officers continued ordering the inmates to stop fighting at least fifteen to twenty times. (Lesina Decl. ¶ 3.) However, neither inmate complied and they continued exchanging blows about eight to ten feet from the yard door. (Id.)

Standing in front of the handcuff port, Defendant Lesina then used oleoresin capsicum spray (OC spray) to subdue Plaintiff and inmate Baca. (Lesina Decl. ¶ 5.) Defendant Lesina discharged a single two second burst of OC spray from roughly nine to ten feet away from the inmates. (Id.) Defendant Lesina again ordered both inmates to stop fighting and separate. (Id.) Plaintiff and inmate Baca then complied. (Id.)

Officer Lesina then ordered inmate Baca to lie face down on the ground in the yard's far corner and ordered Plaintiff to back up toward the handcuff port in order to be handcuffed. (Id. ¶ 6.) Plaintiff complied and was promptly escorted to a shower and subsequently to the nurse, Lori Bree, in order to minimize his discomfort and to neutralize any lingering effects of the OC spray. (Grigg Decl., Ex. B at 3.)

Nurse Bree noted that Plaintiff suffered a variety of minor scrapes and bruises. (Id.) He had a cut on the back of his head which took roughly three weeks to heal. (Grigg Decl., Ex. A at 58:17-20.) Plaintiff's eyes were also red and watery from the OC spray when Nurse Bree evaluated him. (Grigg Decl., Ex. B at 3.) Nurse Bree gave Plaintiff Tylenol to mitigate any discomfort and antibiotics because he claimed inmate Baca bit him. (Id.)

Thereafter, Plaintiff complained about blurred vision and was

United States District Court
For the Northern District of California

examined by an ophthalmologist, Dr. Cochrane, at North Coast Ophthalmology on March 27, 2009 and April 9, 2009.  (Id. at 4, 5.) Dr. Cochrane noted that Plaintiff provided "very inconsistent answers" during the examination.  (Id.)  Dr. Cochrane found that Plaintiff's subjective responses were inconsistent with objective findings.  (Id.)  Dr. Cochrane concluded that nothing was wrong with Plaintiff's eyes.  (Id. at 5.)

DISCUSSION

I.   Motion for Summary Judgment

     A.   Standard of Review

     Summary judgment is properly granted when no genuine and disputed issues of material fact remain and when, viewing the evidence most favorably to the non-moving party, the movant is clearly entitled to prevail as a matter of law.  Fed. R. Civ. P. 56; Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Eisenberg v. Ins. Co. of N. Am., 815 F.2d 1285, 1288-89 (9th Cir. 1987).

     The moving party bears the burden of showing that there is no material factual dispute.  Therefore, the Court must regard as true the opposing party's evidence, if supported by affidavits or other evidentiary material.  Celotex, 477 U.S. at 324; Eisenberg, 815 F.2d at 1289.  The Court must draw all reasonable inferences in favor of the party against whom summary judgment is sought. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Intel Corp. v. Hartford Accident & Indem. Co., 952 F.2d 1551, 1558 (9th Cir. 1991).  A verified complaint may be used as an opposing affidavit under Rule 56, as long as it is based on personal knowledge and sets forth specific facts admissible in

United States District Court
For the Northern District of California

1    evidence.  Schroeder v. McDonald, 55 F.3d 454, 460 & nn.10-11 (9th

2    Cir. 1995).

3        Material facts which would preclude entry of summary judgment

4    are those which, under applicable substantive law, may affect the

5    outcome of the case.  The substantive law will identify which facts

6    are material.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

7    (1986).  Where the moving party does not bear the burden of proof

8    on an issue at trial, the moving party may discharge its burden of

9    showing that no genuine issue of material fact remains by

10   demonstrating that "there is an absence of evidence to support the

11   nonmoving party's case." Celotex, 477 U.S. at 325.  The burden

12   then shifts to the opposing party to produce "specific evidence,

13   through affidavits or admissible discovery material, to show that

14   the dispute exists." Bhan v. NME Hosps., Inc., 929 F.2d 1404, 1409

15   (9th Cir. 1991), cert. denied, 502 U.S. 994 (1991).  A complete

16   failure of proof concerning an essential element of the non-moving

17   party's case necessarily renders all other facts immaterial.

18   Celotex, 477 U.S. at 323.

19       B.   Evidence Considered

20       A district court may only consider admissible evidence in

21   ruling on a motion for summary judgment.  See Fed. R. Civ. P.

22   56(e); Orr v. Bank of America, 285 F.3d 764, 773 (9th Cir. 2002).

23       In support of Defendants' motions for summary judgment,

24   affidavits have been filed by Attorney Grigg and Defendants Senuta,

25   Bemrose and Lesina.

26       Plaintiff verified his complaint filed on September 2, 2009 by

27   signing it under penalty of perjury.  Plaintiff also verified his

28   declaration filed on November 22, 2010 by signing it under penalty

of perjury.   Therefore, for the purposes of this Order, the Court will treat Plaintiff's original complaint and his declaration as affidavits in opposition to Defendants' motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure.  See Schroeder, 55 F.3d at 460 & nn.10-11.

C.   Legal Claims

Plaintiff maintains that on March 24, 2009, Defendant Senuta acted with deliberate indifference to his physical safety by releasing him into an exercise area along with inmate Baca, who subsequently assaulted him.   Plaintiff claims that Defendants Senuta and Bemrose acted with deliberate indifference by failing to intervene while he was being attacked.   Furthermore, Plaintiff claims that Defendant Lesina used excessive force against him by responding to the scene and spraying him in the eyes and face with OC spray, which caused him pain and temporary blindness in both eyes.

1.   Deliberate Indifference Claim

The Eighth Amendment requires prison officials to take reasonable measures to guarantee the safety of prisoners.  See Farmer v. Brennan, 511 U.S. 825, 832 (1994).   In particular, prison officials have an affirmative duty to protect inmates from violence at the hands of other inmates.   See id. at 833.   The failure of a prison official to protect inmates from attacks by other inmates or from dangerous conditions at the prison violates the Eighth Amendment only when two requirements are met: (1) the objective component -- the deprivation alleged must be sufficiently serious, see Farmer, 511 U.S. at 834 (citing Wilson v. Seiter, 501 U.S. 294, 298 (1991); and (2) the subjective component -- the prison official

10

United States District Court
For the Northern District of California

must possess a sufficiently culpable state of mind.  See id.
(citing Wilson, 501 U.S. at 297).

In determining whether a deprivation of a basic necessity is
sufficiently serious to satisfy the objective component of an
Eighth Amendment claim, a court must consider the circumstances,
nature, and duration of the deprivation.  Id. at 834 (citing
Wilson, 501 U.S. at 298).  With respect to the subjective
component, the requisite state of mind depends on the nature of the
claim.  In prison-conditions cases, the necessary state of mind is
one of "deliberate indifference."  See, e.g., Allen v. Sakai, 48
F.3d 1082, 1087 (9th Cir. 1994) (outdoor exercise); Farmer, 511
U.S. at 834 (inmate safety); Estelle v. Gamble, 429 U.S. 97, 104
(1976) (inmate health); Wilson, 501 U.S. at 302-03 (general
conditions of confinement).

A prison official cannot be held liable under the Eighth
Amendment for failing to guarantee the safety of a prisoner unless
the standard for criminal recklessness is met, i.e., the official
knows of and disregards an excessive risk to inmate health or
safety.  See Farmer, 511 U.S. at 837.  The official must both be
aware of facts from which the inference could be drawn that a
substantial risk of serious harm exists, and he must also draw the
inference.  See id.

Deliberate indifference describes a state of mind more
blameworthy than negligence.  See Farmer, 511 U.S. at 835 (citing
Estelle, 429 U.S. at 104).  Neither negligence nor gross negligence
will constitute deliberate indifference.  See Farmer, 511 U.S. at
835-36 & n.4; see also Estelle, 429 U.S. at 106 (establishing that
deliberate indifference requires more than negligence).

11

United States District Court
For the Northern District of California

1    Here, to be liable for failure to prevent serious harm to an

2    inmate, Defendants Senuta, Bemrose and Lesina must each

3    individually know of and consciously disregard an excessive risk to

4    Plaintiff's safety.  See Farmer, 511 U.S. at 837.

5    The Court finds that Plaintiff has failed to raise a triable

6    issue as to whether Defendants acted with deliberate indifference

7    in regard to guaranteeing his personal safety.  To survive the

8    summary judgment motion, Plaintiff must raise a triable issue of

9    fact as to both the objective and subjective prongs of the

10   deliberate indifference standard.  Viewing the evidence in the

11   light most favorable to Plaintiff, there is no triable issue

12   because Defendants were not subjectively deliberately indifferent

13   to a risk to Plaintiff's safety.

14   The facts as alleged amount at most to negligence based on

15   Defendants Senuta's and Bemrose's mistakenly placing Plaintiff and

16   another inmate into the same yard and failing to intervene quickly

17   enough to guarantee Plaintiff's safety.  Negligence and even gross

18   negligence are not enough to amount to an Eighth Amendment

19   violation.  Farmer, 511 U.S. at 835.  Deliberate indifference is

20   not shown by merely stating that a defendant should have known of a

21   risk, but requires an actual perception of a risk that does not

22   exist merely because a reasonable person should have perceived a

23   risk.  Id. at 836 & n.4.

24   Plaintiff's deliberate indifference claim with respect to

25   Defendant Senuta is untenable as a matter of law because she was

26   unaware of any risk of harm associated with inmate Baca's release

27   for recreational yard time into what she believed to be an empty

28   yard.  Defendant Senuta did not actually know of nor could she

**United States District Court**
For the Northern District of California

infer that releasing inmate Baca for yard time would expose Plaintiff to a substantial risk of harm.   Furthermore, Defendants Senuta and Bemrose responded immediately upon recognizing that the inmates were involved in an altercation.

Plaintiff has not presented any evidence that either Defendant Senuta or Bemrose acted with criminal recklessness.   Therefore, the Court finds that Plaintiff has failed to raise a triable issue of fact as to whether Defendants Senuta and Bemrose acted with deliberate indifference under the subjective prong of Farmer.   511 U.S. at 834.   Defendants Senuta and Bemrose are entitled to a judgment as a matter of law on Plaintiff's deliberate indifference claim.

2.   Excessive Force Claim

In order to state a claim for the use of excessive force in violation of the Eighth Amendment, Plaintiff must allege facts that, if proven, would establish that prison officials applied force "maliciously and sadistically to cause harm," rather than in a good-faith effort to maintain or restore discipline.   Hudson v. McMillian, 503 U.S. 1, 6-7 (1992).   The extent of injury suffered by an inmate is one of the factors to be considered in determining whether the use of force is wanton and unnecessary.   Id.   Not every malevolent touch by a prison guard gives rise to a federal cause of action; the Eighth Amendment's prohibition of cruel and unusual punishment necessarily excludes from constitutional recognition de minimis uses of physical force.   Id. at 9-10.   Guards may use force only in proportion to the need for it in each situation.   Spain v. Procunier, 600 F.2d 189, 195 (9th Cir. 1979).

In determining whether the use of force was for the purpose of

**United States District Court**
For the Northern District of California

maintaining or restoring discipline or, rather, for the malicious
and sadistic purpose of causing harm, a court may evaluate the need
for the application of force, the relationship between that need
and the amount of force used, the extent of any injury inflicted,
the threat reasonably perceived by the responsible officials, and
any efforts made to temper the severity of a forceful response.
Hudson, 503 U.S. at 7.  However, courts must accord prison
administrators wide-ranging deference in the adoption and execution
of policies and practices to further institutional order and
security.  Bell v. Wolfish, 441 U.S. 520, 547 (1979); Jeffers v.
Gomez, 267 F.3d 895, 917 (9th Cir. 2001).

   The Court finds that Plaintiff has failed to raise a triable
issue as to whether Defendant Lesina used excessive force by
spraying him in the eyes and face with OC spray.  To overcome the
summary judgment motion, Plaintiff must raise a triable issue of
fact establishing that Defendant Lesina applied force "maliciously
and sadistically to cause harm," rather than in a good-faith effort
to maintain or restore discipline.

   To promote staff safety, CDCR policy dictates that
correctional officers should not rush into physical altercations
between inmates, and instead, must order inmates to cease fighting.
(Bemrose Decl. ¶ 15.)  In situations where inmates disregard those
orders, correctional officers are directed to use OC spray as
reasonably necessary to subdue the inmates without endangering
themselves or other staff.[4]  (Lesina Decl. ¶ 4.)  The spray makes

---

   [4] Inmates are on notice and understand that if they do not
follow orders during violent altercations between inmates, CDCR
officers may use OC spray to stop them.  (Lesina Decl. ¶ 4.)

United States District Court
For the Northern District of California

it difficult for inmates to continue fighting because it temporarily makes it difficult to see and causes them to cough. (Id.)  CDCR staff are trained to aim for the face because that is where the spray will be most effective, which allows correctional officers to regain control of non-compliant inmates more rapidly. OC spray is disbursed from a canister in a cone fashion, hitting a surface area of approximately three feet wide at a distance of nine to ten feet.  (Id. ¶¶ 5-6.)

Based on Plaintiff's refusal to comply with the direct orders of correctional officers and his disorderly behavior, Defendant Lesina states that he determined that spraying OC at Plaintiff was necessary for the purpose of maintaining order and discipline. (Lesina Decl. ¶ 5.)  Defendant Lesina complied with CDCR policy, which required him to use OC spray -- the lowest level of force -- to keep Plaintiff from hurting himself or others.  See Spain v. Procunier, 600 F.2d 189, 195 (9th Cir. 1979) (where, "after adequate warning," a prisoner acts in such a way as to present "a reasonable possibility that slight force will be required," use of chemical spray "may be a legitimate means for preventing small disturbances from becoming dangerous").  Defendant Lesina states that he acted to preserve order in response to a reasonably perceived threat that was created by Plaintiff and inmate Baca, and Plaintiff offers no contrary evidence.  Therefore, a finder of fact could reasonably conclude that some force by Defendant Lesina was necessary to maintain order, and that his use of OC spray was acceptable under the circumstances.  See id. (a demonstrably dangerous and painful substance, tear gas, did not violate the Eighth Amendment when used to contain disturbances that threatened

15

United States District Court
For the Northern District of California

an equal or greater harm); see also Michenfelder v. Sumner, 860 F.2d 328, 334-36 (9th. Cir. 1988) (noting that while tear gas may not be used to punish a prisoner, it can be reasonably used to quell disorders and to compel obedience).

Furthermore, Plaintiff's injuries did not necessarily indicate that the force used by Defendant Lesina was excessive. Plaintiff claims he suffered from obstructed vision and physical pain. While the extent of injury suffered by an inmate is one of the factors to be considered in determining whether the use of force is wanton and unnecessary, the absence of serious injury does not end the Eighth Amendment inquiry. See Hudson, 503 U.S. at 7. That is not to say that every malevolent touch by a prison guard gives rise to a federal cause of action; the Eighth Amendment's prohibition of cruel and unusual punishment necessarily excludes from constitutional recognition de minimis uses of physical force. See id. at 9-10 (blows directed at inmate which caused bruises, swelling, loosened teeth and cracked dental plate were not de minimis). A finder of fact could reasonably conclude that Plaintiff's injuries indicated that Defendant Lesina's use of force was de minimis as OC spray's injurious effects are significantly less than those that can be caused by other forms of control, i.e., the use of batons and guns. However, even if Plaintiff had produced sufficient evidence that his injuries indicated Defendant Lesina's use of force was not de minimis, this one factor is insufficient to raise a dispute of material fact that the force used was not necessary under the circumstances.

In sum, the undisputed evidence before the Court shows that Plaintiff and inmate Baca had engaged in a fight. Plaintiff did

16

**United States District Court**
For the Northern District of California

not follow Defendant Lesina's and other officers' direct orders to stop fighting.  Viewing the evidence in the light most favorable to Plaintiff, there is no triable issue because Defendant Lesina stated that he acted in good faith by using OC spray to stop the fight, Plaintiff has no evidence otherwise, and no reasonable fact finder would find that Defendant Lesina applied force maliciously and sadistically to cause harm.  Accordingly, Plaintiff has failed to establish a triable issue of fact that he was subjected to excessive force by the Defendant Lesina.  Defendant Lesina is therefore entitled to judgment as a matter of law on the Eighth Amendment excessive force claim.

> D.    Qualified Immunity

Defendants claim that summary judgment is also proper in this case because they are entitled to qualified immunity from liability for civil damages.  The defense of qualified immunity protects "government officials . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). The threshold question in qualified immunity analysis is: "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" Saucier v. Katz, 533 U.S. 194, 201 (2001).  A court considering a claim of qualified immunity must determine whether the plaintiff has alleged the deprivation of an actual constitutional right and whether such right was "clearly established." Pearson v. Callahan, 555 U.S. 223, 129 S. Ct. 808, 818 (2009) (overruling the sequence of the two-part test that

United States District Court
For the Northern District of California

required determination of a deprivation first and then whether such right was clearly established, as had been required by <u>Saucier</u>, and holding that a court may exercise its discretion in deciding which prong to address first, in light of the particular circumstances of each case).  The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that her or his conduct was unlawful in the situation she or he confronted.  <u>Saucier</u>, 533 U.S. at 201-202.

Here, the Court has found no evidence that Defendants' actions rose to the level of a constitutional violation.  However, assuming that Plaintiff was deprived of a constitutional right, the Court next considers whether Defendants' conduct was clearly unlawful.  Plaintiff alleges that Defendants Senuta and Bemrose were deliberately indifferent to his safety by releasing inmate Baca in the yard and failing to respond adequately upon seeing the inmates fighting.

The Court finds that Defendants are entitled to qualified immunity because they have produced sufficient evidence that a reasonable officer in their position would have believed that their actions were reasonable based on the circumstances they confronted.  Inmate Baca's release into A-Pod yard was the result of a mistake in placing the indicator peg in the incorrect slot.  Defendants Senuta and Bemrose discovered this mistake only after noticing Plaintiff and inmate Baca wrestling on the surveillance monitor.  Defendants Senuta and Bemrose immediately sounded the alarm and attempted to separate the inmates.  Following CDCR policy, Defendant Lesina ordered the inmates to cease fighting and only resorted to OC spray after the inmates failed to comply.

United States District Court
For the Northern District of California

Upon recognizing that two inmates were inadvertently released into the same yard and were fighting, it would not have been clear to a reasonable officer that the immediate actions taken by Defendants Senuta and Bemrose were unlawful.  Additionally, a reasonable officer in Defendant Lesina's position would have thought it lawful to use OC spray on Plaintiff after he disobeyed orders to cease fighting, especially in light of CDCR policy dictating that particular protocol.  Because the law and circumstances on March 24, 2009 did not put Defendants individually on notice that their conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate.  See Saucier, 533 U.S. at 202.  Accordingly, Defendants' motion for summary judgment is GRANTED.

II.   Review of Amendment to Complaint

     A.   Retaliation Claim

     In the May 10, 2010 Order of Service, the Court found that Plaintiff failed to state a cognizable retaliation claim stemming from inmate Baca's release into the same yard, which resulted in Plaintiff's assault.

     In his amendment to the complaint, Plaintiff alleges that Defendants Senuta, Bemrose and Lesina knew about complaints he had filed against other PBSP officers, and that this knowledge was a substantial and motivating factor for Defendants' actions on March 24, 2009.  Plaintiff also asserts that unidentified inmates told him Defendant Senuta previously had intentionally released two inmates for yard time simultaneously in a different housing unit. (Grigg Decl., Ex. A at 73:3-25, 74:1-10.)

     "Within the prison context, a viable claim of First Amendment

United States District Court
For the Northern District of California

retaliation entails five basic elements:  (1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal." Rhodes v. Robinson, 408 F.3d 559, 567-68 (9th Cir. 2005) (footnote omitted).  To prove retaliation, a plaintiff must show that the defendants took adverse action against him or her that "would chill or silence a person of ordinary firmness from future First Amendment activities." White v. Lee, 227 F.3d 1214, 1228 (9th Cir. 2000) (citing Mendocino Envtl. Ctr. v. Mendocino County, 192 F.3d 1283, 1300 (9th Cir. 1999)).

Retaliation is not established simply by showing adverse activity by a defendant after protected speech; rather, the plaintiff must show a nexus between the two.  See Huskey v. City of San Jose, 204 F.3d 893, 899 (9th Cir. 2000).  However, retaliatory motive may be shown by the timing of the alleged retaliatory act, as well as by direct evidence.  Bruce v. Ylst, 351 F.3d 1283, 1288-89 (9th Cir. 2003).

Here, Plaintiff's amended retaliation claim still does not allege any nexus between his grievances against other officers and the alleged purposeful release of inmate Baca into A-Pod. Plaintiff alleges that Defendants conspired intentionally to release inmate Baca into the A-Pod recreation yard to harm him. Plaintiff bases his claim on his own deposition testimony and hearsay from other inmates.  However, this conspiracy theory is conclusory because Plaintiff fails to offer any factual allegations suggesting that Defendants knew the other officers or were aware of

1  the grievances that were filed against them.

2      Accordingly, Plaintiff fails to state a claim of retaliation

3  because he has failed to allege sufficient facts to support his

4  legal theory.  The Court finds that Plaintiff has failed to state a

5  cognizable First Amendment retaliation claim against Defendants;

6  therefore, this claim is DISMISSED without further leave to amend.

7      B.   Supervisory Liability Claim

8      In his amended supervisory liability claim, Plaintiff alleges

9  Defendant Jacquez imposed a dangerous prison condition on him by

10 permitting Defendant Senuta to work as a control booth operator.

11 Plaintiff alleges further that Defendant Jacquez disregarded

12 prisoner safety because he knew that Defendant Senuta had a history

13 of misconduct in the same position.

14     The Ninth Circuit has stated:

15         [S]ection 1983 suits do not impose liability on
           supervising officers under a respondeat superior theory
16         of liability.  Instead, supervising officers can be held
           liable under section 1983 "only if they play an
17         affirmative part in the alleged deprivation of
           constitutional rights."  [citation omitted].  The
18         supervising officer has to "set in motion a series of
           acts by others . . . which he knew or reasonably should
19         have known, would cause others to inflict the
           constitutional injury."  [citation omitted].
20
21 Graves v. City of Coeur D'Alene, 339 F.3d 828, 848 (9th Cir. 2003).

   Additionally, a supervisor may be liable under § 1983 if a
22
   plaintiff can show that "'in light of the duties assigned to
23
   specific officers or employees, the need for more or different
24
   training is obvious, and the inadequacy so likely to result in
25
   violations of constitutional rights, that the policy-makers . . .
26
   can reasonably be said to have been deliberately indifferent to the
27
   need.'"  Clement v. Gomez, 298 F.3d 898, 905 (9th Cir. 2002); see
28
   also Redman v. County of San Diego, 942 F.2d 1435, 1446 (9th Cir.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1991) (en banc) ("Supervisory liability exists even without overt personal participation in the offensive act if supervisory officials implement a policy so deficient that the policy itself is a repudiation of constitutional rights and is the moving force of a constitutional violation").

Here, nothing in Plaintiff's pleadings sufficiently indicates Defendant Senuta's release of inmate Baca was anything but her own isolated mistake resulting from a failure to place the indicator peg into the correct control panel slot. Although Plaintiff alleges that other inmates told him Defendant Senuta previously intentionally released two inmates into the same yard, the information alleged is unsubstantiated hearsay. Plaintiff's theory that Defendant Jacquez disregarded prisoner safety by permitting Defendant Senuta to work as a control booth operator is conclusory because Plaintiff fails to offer any factual allegations suggesting that Defendant Jacquez knew Defendant Senuta had a history of misconduct, or was aware that Defendant Senuta had previously intentionally released two inmates into the same yard.

The Court finds that Plaintiff fails to allege sufficient facts to support his supervisory liability claim against Defendant Jacquez. Nowhere does Plaintiff allege that Defendant Senuta's mistaken action was the result of a deficient prison policy, that Defendant Jacquez directed or set events into motion that resulted in Plaintiff's alleged injury, or that any kind of training could have prevented Defendant Senuta's mistake. Even if Plaintiff had alleged sufficient facts showing that Defendant Jacquez could be liable in his supervisory capacity, because Defendants Senuta, Bemrose and Lesina were found not liable for any claims, there

United States District Court
For the Northern District of California

1   would be no supervisory liability.

2       Because Plaintiff has not plead any facts which could support

3   a supervisory liability claim against Defendant Jacquez under

4   § 1983, Plaintiff's claim against Defendant Jacquez is DISMISSED

5   without further leave to amend.

6                            CONCLUSION

7       In light of the foregoing, the Court orders as follows:

8       1.   Defendants' motion for summary judgment (docket no. 20)

9   is GRANTED.  Plaintiff's federal claims stemming from the

10  allegations in his complaints have all been resolved; however, the

11  Court's ruling does not foreclose Plaintiff from proceeding with

12  any related negligence or other state law claims in state court.

13      2.   Plaintiff's retaliation and supervisory liability claims

14  are DISMISSED without further leave to amend.

15      3.   The Clerk of the Court shall enter judgment in favor of

16  Defendants Senuta, Bemrose, Lesina and Jacquez.  The Clerk shall

17  also terminate all pending motions and close the file.

18      4.   This Order terminates Docket no. 20.

19      IT IS SO ORDERED.

20  DATED: 8/11/2011                 _Claudia Wilken_____

21                                   CLAUDIA WILKEN
                                     United States District Judge

22

23

24

25

26

27

28

23

UNITED STATES DISTRICT COURT
FOR THE
NORTHERN DISTRICT OF CALIFORNIA

CARLTON PAYNE,

        Plaintiff,

  v.

C SENUTA et al,

        Defendant.

Case Number: CV09-04084 CW

**CERTIFICATE OF SERVICE**

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

That on August 11, 2011, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.

Carlton  Payne J-88526
Pelican Bay State Prison
P.O. Box 7500
C12-222
Crescent City,  CA 95532

Dated: August 11, 2011

Richard W. Wieking, Clerk
By: Nikki Riley, Deputy Clerk

United States District Court
For the Northern District of California

24